A. B. BAUMSTIMLER, et al.,
Plaintiffs-Appellees,

v.

Bueford B. RANKIN, et al., Defendants,

Kenneth J. Laughlin,
Defendant-Appellant.

No. 81–1045.

United States Court of Appeals,
Fifth Circuit.

June 9, 1982.

Richards, Harris & Medlock, James P. Bradley, Dallas, Tex., James Ingram, San Antonio, Tex., Will Hadden, Odessa, Tex., for defendant-appellant.

Wendell Coffee, Lubbock, Tex., Ruff Ahders, Warren Burnett, Associated, Odessa, Tex., for plaintiffs-appellees.

Roy Bell, Odessa, Tex., for other interested parties.

Before BROWN, GOLDBERG and GEE, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

A. B. Baumstimler, the holder of two letters patent on oil well clean-out tools, sued Kenneth Laughlin, Beuford Rankin, and John Barbee for infringement and, after a jury trial on liability, received a judgment against all defendants. Defendant Laughlin appeals, alleging a multitude of errors, including incorrect instructions to the jury, insufficient evidence of infringement, improper submission of the issue of validity to the jury, and improper determination of money damages by the District Judge at the later hearing on damages. Finding that the District Court erred in instructing the jury as to the defendant's burden of proof required to overcome the presumption of validity of the patents, we reverse and remand.[1]

## I. Facts

### A. The Patents—Catching Junk

In July 1967, Baumstimler filed an application for a patent for an oil well clean-out tool. Patent No. 3,406,757 ('757 patent), issued on October 22, 1968, is for a hydrostatic tool used to remove sand and debris from wells. Hydrostatic tools for retrieving junk or undesired objects from the bottom of a well had been available for several years prior to Baumstimler's application for a patent. The basic principle upon which these tools operate involves inserting a hollow cylinder into the well until the cylinder is immersed in the well fluid. The cylinder contains a valve which controls the flow of fluid into the cylinder. The pressure of the fluid outside the cylinder is greater than that inside the cylinder. When the cylinder reaches the bottom of the well, the valve is opened and because of pressure differential, the fluid from the well moves into and through the cylinder, carrying debris, which is retained in the cylinder. The cylinder and debris are then extracted from the well. In layman's terms, the clean-out tool operates like a drinking straw. Thus if one inserted a straw into a drink with the hole covered by a finger and then removed the finger, fluid would flow into the straw.

---

1. While our disposition of this case does not require us to reach the other issues raised by Laughlin, we offer some comments to facilitate retrial.

The flow rate in these hydrostatic tools is a function of the pressure differential between the well hole fluid and the pressure inside the cylinder, as well as the diameters of the passages within the well clean-out tool. Should the fluid rush into the tool too rapidly, the tool moves upward from the bottom and fails to pick up all debris. To avoid this problem of fluid surge, the patently obvious answer is to slow the entry of the fluid. That result can be achieved in several ways. Previously existing tools had used a system of chokes (an area of reduced cross-sectional area to restrict flow) or water cushions (a layer of water inside the cylinder over the valve which increases the pressure above the valve and thereby decreases the pressure differential). Baumstimler's '757 patent reduced the surge of fluid by varying the diameter of the passage through the use of a donut shaped ring, or orifice, whose size could be adjusted.[2]

Essentially, then, Baumstimler's patent, relying on prior art, added one new element, that of the orifice to control the flow.

In May 1969, Baumstimler received a second patent, Patent No. 3,446,283 ('283 patent), covering the same device as the '757 patent but altered so as to be capable of simultaneously cleaning a well and removing a down hole tool or plug. Down hole plugs have long been used in oil field operations to isolate sections of a well in order to perform processes to facilitate oil recovery. The process may generate sand and other debris which fall on top of the plug. Thus to remove the plug, the debris must also be cleared from the path of the plug retriever. The '283 patent, by attaching a clean-out tool to a plug retriever, both removes the debris and the plug in one trip. Baumstimler's inspiration for this invention was a Mr. Carter, who had called Baumstimler to a job site and asked him if he could adapt his clean-out tool so that a retrieving head could be screwed onto the tool. Baumstimler cut off the bottom-most portion of a clean-out tool, threaded its end, and screwed a "Baker" retrieving head onto it, completing the invention on that very day.

The '283 patent was a "continuation-in-part" of the '757 patent and thus its patentability was partially dependent on the patentability of the '757 clean-out tool.

## B. *The Parties*

Defendant Laughlin was hired by Baumstimler in 1973. Laughlin was familiar with hydrostatic well clean-out tools from his prior employment with Cavins Corporation, the manufacturer of several oil well clean-out tools, including the "multi-surge junk-snatcher", a tool discussed in more detail below. In March 1975 Baumstimler fired Laughlin upon learning that Laughlin had plans to go into competition with him. After leaving the employment of Baumstimler, Laughlin began renting tools from Defendant Barbee until he subsequently purchased parts from Cavins and had his own tools manufactured. Defendant Rankin had also been employed previously by Cavins before working for Baumstimler. After his employment with Baumstimler terminated in 1975, Rankin worked as an independent contractor, leasing tools from Barbee and Laughlin. The tools used by all the defendants were allegedly similar to those of Baumstimler except that a drilled hole substituted for the interchangeable an-

---

2. The donut shaped device or annular ring was described in the '757 patent as follows:

A metering device in the form of an orifice is interposed between the valve unit and the relief valve in order to control sudden pressure surges.

\* \* \* \* \* \*

The size of the replaceable orifice 75 is selected to control the fluid flow into chamber 54 in accordance with the bottom hole well pressure anticipated to be encountered when the tool is made up. The quick change orifice prevents a sudden surge of fluid into the tool, which might otherwise cause the tool to "jump" off the bottom upon actuation of valve 57, to thereby leave junk on the bottom of the hole. This action is more likely to occur when the tool is run into the hole on a wire line since the drill stem or chamber above the valve is limited to a small volume. Therefore, in wells having a high bottom hole pressure the fluid flow through the tool causes the inlet to jump off the junk whereby the debris fails to enter the junk section. The orifice prevents this action.

nular ring or orifice found in Baumstimler's patents.

## C. *The Litigation*

Baumstimler and Basin Packer Co. (BPC) filed suit for infringement of both patents against Laughlin, Rankin, and Barbee.[3] In June 1978, three years after the filing of the complaint and approximately one year prior to the actual trial, Baumstimler filed a disclaimer under 35 U.S.C. § 253[4] with the Patent Office, disclaiming five of his seven claims in the '757 patent.

The infringement claim was tried to a jury in May 1979 on the issue of liability only. The jury returned a verdict against all defendants for infringement of both patents '757 and '283.[5] Laughlin's motion for j.n.o.v. was denied. In August 1979, the damage issue was tried to the Court, jury trial on this issue having been waived.[6] The District Court, after returning findings of fact and conclusions of law on the damage issue, assessed compensatory damages and exemplary damages for willful and wanton infringement. Laughlin's motions for j.n.o.v., new trial, modification of the

damage award, and dissolution of a temporary injunction entered prior to the award of damages, were all denied.

This appeal, prosecuted by Laughlin only, raises several issues, including challenges to the instructions and manner in which the issues were submitted to the jury, sufficiency of evidence, invalidity of the patents as obvious under 35 U.S.C. § 103, and improper determination of damages. Laughlin contends that the District Court erroneously instructed the jury that the burden of overcoming the presumption of validity of the patents was by "clear and convincing" proof rather than by a preponderance of the evidence, the standard that applies when the Patent Office in granting the patent has failed to consider prior art. The jury instructions are also questioned for improperly requiring that all defendants prove all their affirmative defenses in order to prevail. Laughlin also asserts that the District Court erred in using a general verdict form. As to the damage award, Laughlin contends that the District Court improperly used lost profits to determine the measure of damages, that Baumstimler did not prove his

---

3. BPC was subsequently dismissed from the action for lack of proprietary interest in the patents in suit, both of which had been issued to Baumstimler and had not been assigned to BPC. Baumstimler is the majority stockholder and president of BPC, which manufactured and exploited the patented inventions of Baumstimler. The only other shareholder in BPC is Baumstimler's wife.

4. Section 253 provides:

    **§ 253. Disclaimer**

    Whenever, without any deceptive intention, a claim of a patent is invalid the remaining claims shall not thereby be rendered invalid. A patentee, whether of the whole or any sectional interest therein, may, on payment of the fee required by law, make disclaimer of any complete claim, stating therein the extent of his interest in such patent. Such disclaimer shall be in writing, and recorded in the Patent and Trademark Office; and it shall thereafter be considered as part of the original patent to the extent of the interest possessed by the disclaimant and by those claiming under him.

    In like manner any patentee or applicant may disclaim or dedicate to the public the entire term, or any terminal part of the term, of the patent granted or to be granted.

    Baumstimler, in the disclaimer, stated: "I have reason to believe, without deceptive in-

tent, the claims of the letters patent are too broad or invalid."

5. VERDICT

    We, the Jury, find for the Plaintiffs A. B. Baumstimler and make the following answers:

    1. The following parties infringed the Plaintiffs' alleged valid patent, if any, Number 3,406,757, "Patent 757", to wit: (Answer by using an "X" in the appropriate space.)

       (a.) Bueford B. Rankin    X __(yes)__    __(no)__

       (b.) Kenneth J. Laughlin    X __(yes)__    __(no)__

       (c.) John Barbee    X __(yes)__    __(no)__

    2. The following parties infringed the Plaintiffs' alleged valid patent, if any, Number 3,446,283, "Patent 283", to wit: (Answer by using an "X" in the appropriate space.)

       (a.) Bueford B. Rankin    X __(yes)__    __(no)__

       (b.) Kenneth J. Laughlin    X __(yes)__    __(no)__

       (c.) John Barbee    X __(yes)__    __(no)__

6. Because of the death of the District Judge who presided over the jury trial on liability, damages were assessed by another judge.

damages sufficiently, that the damages should have been allocated to the value created by the patentable improvements, and that the District Court should not have awarded treble damages for willful and wanton infringement. Because we agree that the District Court improperly required Laughlin to establish invalidity of the patents only by satisfaction of the heavier "clear and convincing" burden of proof, rather than the less demanding "preponderance of the evidence" standard, we reverse and remand. Damage findings, being dependent on the determination of validity, fall automatically.

### II. *Patent Invalidity*

#### A. *Burden of Proof*

Patents are presumed valid. 35 U.S.C. § 282. *See Arbrook, Inc. v. American Hospital Supply Corp.*, 645 F.2d 273, 276 n.1 (5th Cir. 1981); *Ludlow Corp. v. Textile Rubber & Chemical Co.*, 636 F.2d 1057, 1059 (5th Cir. 1981); *Continental Oil Co. v. Cole*, 634 F.2d 188, 195 (5th Cir.), *cert. denied*, 454 U.S. 830, 102 S.Ct. 124, 70 L.Ed.2d 106 (1981); *John Zink Co. v. National Airoil Burner Co.*, 613 F.2d 547, 551 (5th Cir. 1980); *Harrington Manufacturing Co. v. White*, 475 F.2d 788, 793–94 (5th Cir.), *cert. denied*, 414 U.S. 1040, 94 S.Ct. 542, 38 L.Ed.2d 331 (1973); *Beckman Instruments, Inc. v. Chemtronics, Inc.*, 428 F.2d 555, 560 (5th Cir.), *cert. denied*, 400 U.S. 956, 91 S.Ct. 353, 27 L.Ed.2d 264 (1970). Thus the burden of establishing invalidity rests on the party asserting that invalidity, 35 U.S.C. § 282, and this burden is more than a mere preponderance of the evidence. *Ludlow Corp., supra* (discussing description of burden as "beyond a reasonable doubt" or "by clear and convincing evidence"); *John Zink Co., supra; Parker v. Motorola, Inc.*, 524 F.2d 518, 521 (5th Cir. 1975), *cert. denied*, 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 799 (1976); *Harrington Manufacturing Co. supra; Hobbs v. United States Energy Commission*, 451 F.2d 849, 856 (5th Cir. 1971).

However, when the Patent Office has not considered all of the prior art in issuing the patent, this Circuit has made clear that the presumption of validity is weakened. "[W]e have made it clear that when a defendant in an infringement suit attacks the validity of a patent on the ground that it was issued without consideration by or presentation to the Patent Office of pertinent prior art, the reason for the presumption dissipates, and the presumption is weakened." *Parker v. Motorola, Inc.*, 524 F.2d at 521. *See Continental Oil Co. v. Cole*, 634 F.2d at 195; *John Zink Co. v. National Airoil Burner Co.*, 613 F.2d at 551; *Cathodic Protection Service v. American Smelting & Refining Co.*, 594 F.2d 499, 505 (5th Cir.), *cert. denied*, 444 U.S. 965, 100 S.Ct. 453, 62 L.Ed.2d 378 (1979); *Steelcase, Inc. v. Delwood Furniture Co.*, 578 F.2d 74, 77 (5th Cir. 1978), *cert. denied*, 440 U.S. 960, 99 S.Ct. 1503, 59 L.Ed.2d 774 (1979); *Harrington Manufacturing Co. v. White*, 475 F.2d at 795; *American Seating Co. v. Southeastern Metals Co.*, 412 F.2d 756, 760 (5th Cir. 1969). Where the validity of a patent is challenged for failure to consider prior art, the bases for the presumption of validity, the acknowledged experience and expertise of the Patent Office personnel and the recognition that patent approval is a species of administrative determination supported by evidence, *Parker v. Motorola, Inc.*, 524 F.2d at 521, no longer exist and thus the challenger of the validity of the patent need no longer bear the heavy burden of establishing invalidity either "beyond a reasonable doubt" or "by clear and convincing evidence".

#### B. *Prior Art*

In the instant case, the patent and file wrapper on the '757 patent indicate only three references, the Flury patent, the Hartsell patent and the Clark patent. In the case of the '283 patent, the references cited include the same three as those in the '757 application, as well as the '757 patent itself. At trial, Laughlin introduced evidence that specific highly relevant prior art, in the form of hydrostatic tools manufactured by Cavins Corporation, had not been considered by the Patent Office. One of these tools, the Cavins MultiSurge Tool controlled surge through the use of a floating choke. At trial, Baumstimler in fact

admitted that he was familiar with Cavins tools from his prior employment by that company and that his invention for which he received the '757 patent was essentially that of the Cavins tool except for the orifice.[7]

7. The following exchange occurred at trial during cross-examination between Baumstimler and counsel for the defendants:

Q And when you applied for that patent 757, then we can conclude, can we not, Mr. Baumstimler, that you knew that the claimed invention that you were asking for were known and used at the time you applied for them.

A Certain portions of them, yes.

Q All right. In fact, all of them were known except for your claimed orifice, isn't that right?

A I think the law states that you are—

Q Well, I'm not asking you what the law is. Answer my question, please. In fact, all of your claims of 757, at the time you applied for that patent, were known and used by others except for your orifice that you claim, isn't that correct? Yes or no.

A Yes.

\*   \*   \*   \*   \*   \*

Q It's a multisurge junk snatcher that you learned to use at that time [while employed by Cavins, up through December 1952]?

A Yes, sir.

Q And does that multisurge junk snatcher, exhibit B, operate on the same principle that you applied a patent for in your Patent 757?

A Principle, yes.

Q All right. In other words, that junk snatcher on exhibit B had a set of jars, didn't it?

A Yes, sir.

Q All right, and you had a set of jars on yours.

A Yes, sir.

Q 757. That one on exhibit B had a main valve section, didn't it?

A Yes, sir.

\*   \*   \*   \*   \*   \*

Q All right. So, you applied for essentially the same tool as the hydraulic suction bailer that you used as shown in exhibit C, you applied for that same patent claiming it as an invention in Patent 757 except for the orifice?

A Yes, sir.

Q So, when you applied for Patent 757, you knew what you were applying for and claiming as an invention had already been known and used by others, did you not?

A The orifice had not.

Q Except for the orifice?

A Yes, sir.

\*   \*   \*   \*   \*   \*

Q Now, let me just read it [Baumstimler's application for '757 patent] to you here, if you don't mind. Your lawyer has a copy of it and if I read it wrong, he'll tell me. "I, August B. Baumstimler, declare that I am a citizen of the United States of America residing at 2612 East 21st Street. I read the foregoing specifications and claims and I verily believe that I am the original first and sole inventor of the invention in well cleanout tool described and claimed therein, that I do not know and do not believe that this invention was ever known or used before my invention thereof."

Now, that's not true. That's an untrue statement, isn't it?

A Parts of it had been.

Q I know, but except for the orifice?

A Yes, sir.

\*   \*   \*   \*   \*   \*

Q Do you recall that you had seven different claimed inventions. Right? Do you recall that?

A Yes.

\*   \*   \*   \*   \*   \*

Q So, you either knew or should have known that what you were applying for in 1, 3, 4, 5 and 7 were invalid patents. Right?

A I didn't know if they were ever patented in the first place.

Q I know that, but you were claiming them as being not known and not used. So, you knew when you applied for that patent that those 1, 3, 4, 5 and 7 were known and used by others prior to the time that you filed for that patent. That's what you told us. Right?

A Yes, sir.

Q Okay.

A But were they patented at that time?

Q You didn't find where they were patented, did you?

A No, sir.

Q In other words, what you are saying is that if they weren't patented, then you think it's all right to patent them. Is that what you are saying?

A Well, I thought it was, yes.

\*   \*   \*   \*   \*   \*

Q All right. So, let's carry this a little further. At the time you had your agent apply for this 757, you testified that you knew about this hydraulic junk snatcher and the hydraulic suction bailer that's essentially the same as what you applied for in the patent. And that's would we call in patent terms part of the prior art. Do you agree with that? Do you understand what we are talking about there? In other words, when you applied for your patent, the art was known as to how to make these and use these. Right?

A Yes, sir.

Q All right. But you didn't tell, you didn't disclose this to the Patent Office, did you? You didn't tell them about the Cavins tool, did you?

A No. We—

In February 1971, an attorney acting for Baumstimler wrote to Free State Tool Corporation informing them that they were infringing Baumstimler's patents '757 and '283. In response to this letter, the attorney for Free State Tool Corporation informed Baumstimler's attorney that his client had been in business since August 1965 and had been using the apparatus in question since that date and that many companies, including the Cavins Corporation, had utilized such methods previously.[8]

Despite Baumstimler's admitted knowledge of the relationship of his tool to the Cavins tools and further indication of this knowledge through the February 1971 letter from Free State Tool Corporation, Baumstimler did not make the Patent Office aware of the prior art of the Cavins tool after the patent had issued. Nor did he bother to file a disclaimer with the Patent Office until 1978, more than three years after initiation of this lawsuit, at which time he disclaimed five of seven claims in the '757 patent. From Baumstimler's own testimony, it is clear that the Patent Office issued the '757 patent without consideration of relevant prior art.[9]

### C. *The Jury Instructions*

■ Given the introduction of evidence that the Patent Office failed to consider relevant prior art in the form of the Cavins tools, the standard of proof required of

> Q  Answer my question. Did you tell the Patent Office about the Cavins tool, exhibit C and exhibit B and the ones that you knew about back there in 1952.
> A  I never wrote a letter to Washington, no, sir.
> Q  Did you tell the Patent Office about the prior art we are talking about?
> A  No, sir.

8.  The letter from the attorney for Free State Tool Corporation to Baumstimler's attorney stated in part:
> I do not know whether your client is aware of the fact that our client, Free State Tool Corporation, has been in business since August of 1965 and that continuously from that date it has been practicing the methods that it is presently using and it has been using the apparatus that it is presently using. I am sure that your client does not presume to claim as invention, methods or apparatus that were in use in this country long prior to the date of the filing of his applications, not

Laughlin to overcome the presumption of validity of the patents was not "clear and convincing" but simply a preponderance of the evidence. There is no doubt that the District Judge instructed the jury, and repeatedly so, that the defendant's burden was to prove invalidity by "clear and convincing evidence". This error resulted in imposing a heavier burden on the defendants than that required by the law of this Circuit. It is also clear that the District Judge meant to impose a heavier burden on the defendant than that on the plaintiff.

> Now, as I have said, the burden of proof is on the Plaintiff to prove these elements of the case which I have given you by a preponderance of the evidence. . . . As to the Defendant's contention as to the affirmative defenses which I have just given to you, that is, the failure of the patent to be a valid patent, and lack of infringement, the *burden is somewhat stricter.* The Defendant must prove any one or a combination of those affirmative defenses by *clear and convincing evidence.* If you find that the Defendant has established any or a combination of these affirmative defenses by *clear and convincing evidence*, then you must find for the Defendant. . . .

Transcript 351 (emphasis added). Nor is this example an isolated incident but rather one of at least 11 instances in an approximately 40 page charge to the jury.[10]

> only by Free State Tool Corporation but, I might say by many other companies, perhaps the largest of which is the Cavins Corporation which has a principal place of business in Houston, which is considerably closer to your area of activity.

9.  Since the '283 patent was a "continuation-in-part" of the '757 patent, and relied on that prior patent, simply adding a well plug retriever, the failure of the Patent Office to consider the Cavins tool as prior art would also affect the presumption of validity and the subsequent burden of proof on Laughlin to prove invalidity of the '283 patent as well. From the record, it appears that Baumstimler submitted no disclaimer on the '283 patent.

10.  The same incorrect instruction as to the defendant's burden of proving his affirmative defenses was repeated on transcript pages 345, 351, 355, 357, 360, 361, 362, 363, 364, 366, 372.
    The following is one of the most pointed examples of the erroneous jury instruction:

## D. *Waiver*

Baumstimler contends that even if the burden of proof was incorrect, Laughlin waived any objection to the charge. For support of this position, Baumstimler relies on the denial of the motion for j. n. o. v. In its order of September 28, 1979, the District Court stated:

Point of error 17 [that challenging the burden of proof and indicating that preponderance of evidence was the proper standard since the Patent Office did not consider pertinent prior art, especially the Cavins Corp. tools] is probably the most serious Point of Error raised by defendants. It states that the wrong burden of proof was assigned to the defendants to show by affirmative defenses that Patent '757 was invalid. It is the Court's opinion that this argument may be legally correct. However, it is also this Court's opinion that the defendants have waived their objection to this portion of the Court's charge in that they were afforded ample opportunity after the giving of the Charge to ask the Trial Judge to instruct the Jury in a different manner and they failed to so bring this error to the Court's attention. Therefore, this point is also overruled.

We must disagree with the District Judge. The defendants did not waive their objection to the charge. From the record, it is clear that Laughlin's counsel made timely objection to the charge, stating both what he objected to and why.[11]

While it is true that the District Judge provided Laughlin's counsel with an opportunity to provide a correct instruction, saying that he would be glad to accept a different way, Laughlin's counsel, having specifically objected with adequate reasons stated, was not required to submit a new written formal instruction and his response that he didn't know how to formulate the instruction is not fatal. Defendant's counsel had previously submitted instructions with the correct standard indicated, instructions which were not given by the District Judge. F.R.Civ.P. 51 requires only that a party object timely, "stating distinctly the matter to which he objects and the grounds of his objection." There can be no doubt that Laughlin's attorney met the requirements of Rule 51 and thus did not waive any objection to the erroneous jury instructions.

Based on the erroneous instruction as to the defendants' burden of proving invalidity, we reverse and remand. We therefore do not reach the other asserted errors, including the sufficiency of the evidence and as a matter of law the invalidity of the patent as obvious under 35 U.S.C. § 103.

## III. *Cleaning Out the Well*

Although not technically before us, the method of submission to the jury and the calculation of damages leave us with serious doubts about their propriety. While we need not reach the other alleged errors in the submission to the jury and the issue of validity, we wish to make clear that we in no way approve of the manner in which this case was submitted to the jury. First, the District Judge utilized two general verdict

Now, the burden of proof of the affirmative defenses directed to the invalidity of the patents herein having been asserted by the Defendant places the burden of proof as to one or more of these assertions upon the Defendant by what I have already described as *clear and convincing* evidence.

In considering the defense of invalidity, the Court instructs you that the law presumes the patents here in question to be valid, in the absence of *clear and convincing evidence* to the contrary, in other words that it is invalid and presumes further that the patent office acted correctly in issuing the patents in this case.

The presumption of validity continues in effect in favor of the Plaintiff unless there is *clear and convincing evidence* which leads the jury to a different or contrary conclusion. Transcript pages 360–61 (emphasis added)

11. The following objection was made:

MR. HADDEN: The first objection, Your Honor, is that we object to the Court charging the jury that our burden for proving the validity of patent 757 is by clear and convincing evidence because the rule of law is that where there is a failure to disclose the prior art by the patentee, the burden is only by a preponderance of the evidence.

THE COURT: I think I have given them that exception.

forms, one for the plaintiff and one for the defendant. Although the verdict forms specifically allowed the jury to determine which of the several defendants infringed Baumstimler's "alleged valid patent, if any", the instructions require that the defendants sustain all of their defenses.[12]

◼ This is certainly in conflict with the actual requirement that any one defendant need only sustain one decisive defense, not all of them. This problem with the submission, like those discussed below, could largely have been solved through the use of special interrogatories under F.R.Civ.P. 49(a).

◼ Second, from the instructions it is clear that the District Judge left the issue of validity of the patents to the jury. The instructions specifically stated that the disputed issue of the validity of the patents was left to the jury.[13] While the charge made clear that the elements of invention included novelty, utility, and nonobviousness, clearly factual issues, the ultimate legal issue of validity should have been determined by the judge, not the jury. "[T]he ultimate question of patent validity is one of law. . . ." *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545, 556 (1966). This determination is based on certain factual inquiries which are properly resolved by the jury, including the scope and content of the prior art, differences between the prior art and the claims at issue, and the level of ordinary skill in the art. *Id.* Here the jury made no discernible factual determination concerning the prior art so that the District Judge could then determine obviousness, an issue to be determined by a judge, not a jury. Rather, the ultimate issue of validity, dependent on factual inquiries of prior art and legal criteria of obviousness, was left to the jury.

While we generally presume that disputed matters of fact have been resolved favorably to the prevailing party, this case presents a more serious problem than that raised in *Control Components, Inc. v. Valtek, Inc.*, 609 F.2d 763 (5th Cir.), *rehearing denied*, 616 F.2d 892, *cert. denied*, 449 U.S. 1022, 101 S.Ct. 589, 66 L.Ed.2d 484 (1980). In *Valtek*, the District Court submitted to the jury the issue of obviousness without requiring separate special interrogatories on the factual inquiries underlying the obviousness question, the scope and content of prior art and the differences between that art. We held in that case that the interrogatory was not so broadly framed as to leave the ultimate determination of obviousness to the jury. *But see Valtek*, 609 F.2d at 775 (Rubin, J., dissenting). We found implicit in the answer to the interrogatory the jury

12. The judge gave the following instruction:
 Or if the Plaintiff has failed to prove that Defendants have infringed Claims 2 and 6 of Patent 757, then you will find for the Defendants as to Patent No. 757 and you will use Verdict Form No. 2; but if the Defendants have failed to *prove by clear and convincing evidence all seven of said defenses* and Plaintiff has proved by a preponderance of the evidence that Defendants have infringed Claims 2 and 6, then you will find for the Plaintiff as to Patent No. 757.
 (emphasis added)

13. The judge gave the following instructions:
 In other words, this leaves for *your* determination the disputed issues which may be briefly summarized as follows:
 1. *Are the patents* here in issue *valid* patents?
 * * * * * *
 Now, in reference to infringement. In order to prove infringement, the Plaintiff must prove by a preponderance of the evidence that the methods utilized by the Defendant embody every essential step of the invention set forth in one or more of the claims of the patents *found by you to be valid.*
 * * * * * *
 Stated another way, before the methods or processes utilized by the Defendants can be correctly held to infringe, such methods and/or processes must be shown to accomplish substantially the same result, in substantially the same way and manner, and by substantially the same means, as does the invention described in one or more claims of the *patents* here in issue which *you have found to be valid,* if you have so found.
 In other words, you don't get to the question of infringement unless *you find* by a preponderance of the evidence of course that the—unless *you find* that the *patents are valid. If you find that the patents are valid,* then you must of course address yourself to the question of infringement as I am charging you now.
 (emphasis added).

findings on the three factual underpinnings to obviousness as indicated in *John Deere.* We then upheld the jury findings after reviewing to determine if there was substantial evidence to support these findings.

"Full review" in this context amounts to an inquiry whether the judge "correctly applies the law set out in *Graham.*" . . . Like the trial court, we are aided in our inquiry by the jury's findings of fact. If supported by substantial evidence, these findings are apt to strengthen the trial court's legal conclusion.

*Valtek*, 609 F.2d at 768. *See also Hammerquist v. Clarke's Sheet Metal, Inc.*, 658 F.2d 1319, 1322–23 & n.5 (9th Cir. 1981).

■ In the instant case, the jury made no findings of fact on prior art and factual aspects of obviousness, nor did they make a finding on the issue of obviousness. The District Judge incorrectly allowed the jury to determine obviousness and validity, two issues which are clearly legal, not factual. There simply is no factual or legal determination that the patents are valid, given the general verdict form which deliberately left open the question of validity, using the phrase "valid patent, if any."

In a cogent and convincing partial concurrence and partial dissent in *Valtek*, Judge Rubin reviews this Circuit's response to the Supreme Court's determination in *John Deere* that the ultimate question of patent validity is one of law. Specifically, he argues that a general verdict in a patent case deprives the appellate court of any meaningful review. If the reviewing court is to presume that disputed matters of fact

have been resolved favorably to the prevailing party, then the only review is an analysis of the correctness of the jury charge and the existence of substantial evidence to support the verdict.

I think meaningful devotion to *Graham* requires a different course, unique to patent litigation. In this area where decisional responsibility is so clearly divided, the methods of reaching a decision must be more sharply defined; the path to this end is required jury verdicts on special interrogatories, as permitted by Fed.R. Civ.P. 49(a). . . . Moreover, that course [general verdict] has pragmatic difficulties: a relatively minor error in the charge may require a lengthy new trial. Submission on special interrogatories can avert that. *See* Brown, Federal Special Verdicts: The Doubt Eliminator, 1968, 44 F.R.D. 338.

*Valtek*, 609 F.2d at 775 (Rubin, J., dissenting).[14]

■ Special interrogatories under Rule 49(a), whose songs of praise we have repeatedly sounded [15], have especial value in a patent case tried to a jury. Their use is not only practical, facilitating appellate review and avoiding lengthy (as patent cases invariably are) retrial for even relatively minor errors in jury instructions, but accords with the inherent divisional lines between the roles of judge and jury, the boundaries of which are so easily transgressed in patent cases tried to juries. While the use of special interrogatories is left to the sound discretion of the trial judge, failure to utilize this method in a patent case places a

---

**14.** Although written in dissent to failure to grant rehearing en banc in *Valtek* and hence not a statement for the Court, Brown, J., found the use of a general verdict for the issue of obviousness to be in conflict with the *John Deere* opinion, stating:

This case is of exceptional importance because the issues it presents arise in every jury trial of a patent case. Submitting the obviousness issue to a jury for a general verdict, in the manner our previous decisions permit, appears to me to be inconsistent with the precept that "the ultimate question of patent validity is one of law." *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

*Control Components Inc. v. Valtek, Inc.*, 616 F.2d 892 (5th Cir. 1980) (denial of petition for rehearing en banc) (Brown, J., dissenting).

**15.** *See Central Progressive Bank v. Fireman's Fund Insurance Co.*, 658 F.2d 377, 381 n.11 (5th Cir. 1981); *Guidry v. Kem Manufacturing Co.*, 598 F.2d 402, 405–06 (5th Cir.), *petition for rehearing denied*, 604 F.2d 320 (5th Cir. 1979), *cert. denied*, 445 U.S. 929, 100 S.Ct. 1318, 63 L.Ed.2d 763 (1980); *Thrash v. O'Donnell*, 448 F.2d 886, 890 & n.10 (5th Cir. 1971); *Tugwell v. A. F. Klaveness & Co.*, 320 F.2d 866, 867–68 & n.2 (5th Cir. 1963), *cert. denied*, 376 U.S. 951, 84 S.Ct. 967, 11 L.Ed.2d 970 (1964); *R. B. Co. v. Aetna Insurance Co., supra.*

heavy burden of convincing the reviewing court that the trial judge did not abuse his discretion.

> The fact is that one of the sometimes unexpected, but wholesome, results of special interrogatories jury submission is to emphasize the absolute necessity that there be first a clear understanding of the precise legal issues for jury resolution and then a translation of them into articulate questions which may be authoritatively answered by a simple categorical. In a general way this is to say that not only is it the jury's imprecision which is hidden by the traditional general charge and verdict. Many juridical errors of omission and commission by court and counsel are likewise perpetually concealed.

*R. B. Co. v. Aetna Insurance Co.*, 299 F.2d 753, 756–57 (5th Cir. 1962).

In the instant case, had the burden of proof not been incorrect, the use of special interrogatories would have allowed us to determine if the judge correctly interpreted complicated aspects of the patent law and if the jury under the judge's direction did not decide improperly, or at all, the legal question of validity of the patent. We would have specific factual findings to the three *John Deere* questions on obviousness to support a finding by the judge of validity. Further, interrogatories could have covered the willfulness of infringement to provide support for the award of the treble damages. The issue of fraud on the patent office so as to invalidate the patent would also be appropriate for special interrogatories on the factual issues of deliberate withholding and concealment. Judge, jury, and counsel would have been required to "stop, look, listen & think," Brown, Federal Special Verdicts: The Doubt Eliminator, 44 F.R.D. 338, 351 (1968), and we would be provided with factual findings allowing meaningful appellate review. Like Cassandra of old, our prophecies of doom resulting from the use of a general verdict have too often been ignored.

Our final note of concern is with the issue of damages. We have serious doubt about whether the District Judge properly determined the basis for the award. While not technically before us, we wish to highlight some difficulties lest our silence be mistaken for approval. First there is the problem of whether lost profits are the correct measure of damages since Baumstimler's corporation, BPC, was technically the user of the patent and yet held no proprietary interest in the patent, *see* note 3 *supra*, Baumstimler having never gone through the formalities of licensing the patent to the company in which he and his wife were the sole shareholders. When actual damages are not proved, we have allowed the plaintiff to recover a "reasonable royalty". *Hughes Tool Co. v. G. W. Murphy Industries, Inc.*, 491 F.2d 923, 930 (5th Cir. 1973); 35 U.S.C. § 284. Since Baumstimler did not manufacture, sell or use the patented invention, but rather the invention was exploited by BPC, Baumstimler technically had no lost profits.

Even if the proper measure of damages was lost profits, it is uncertain whether Baumstimler proved "but for" the infringement he would have made the sales made by Laughlin. *See Livesay Window Co. v. Livesay Industries, Inc.*, 251 F.2d 469 (5th Cir. 1958); *Hughes Tool Co., supra.* While lost profits need not be established by scientific accuracy, conjecture alone is not sufficient. In *Hughes Tool Co.*, we made clear that the plaintiff must demonstrate with "reasonable probability" the portion of defendant's infringing sales it would have made and while not deciding whether proof of market share was sufficient for the reasonable probability test, we made clear that market share analysis requires an examination of substitutes, demand, manufacturing capability of the patentee, and the amount of profit that would have been made from these additional sales. In this case, the District Court determined that the competing tool, that sold by Cavins, held ten percent of the market. This alone is not sufficient to determine that Baumstimler would have received 90% of the market since possibly the infringers cut into not only Baumstimler's market but that of Cavins as well.

The actual computation of damages also is questionable. There is little evidence of Baumstimler's profit margin which appears to have been determined by the District Court purely on the basis of Laughlin's profit margin. The measure of recovery is not the infringer's profit but those profits lost to the patentee. *See Aro Manufacturing Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964). Also raised by Laughlin are the issues of whether Laughlin's total billings, which included services sold with the tool, should properly have been used in determining damages and whether the damages should have been allocated so as to reflect that portion of the value of the tool attributable to the patented improvements as opposed to the value of the tool without the improvements. It appears that the District Judge did not allow the introduction of evidence showing that the entire rental fee of the tool represented two elements, a fee for the unpatented prior art portions of the tool and a fee for the patented improvements. While we do not decide whether allocation was proper or necessary, this argument is one that must be considered by the District Court in assessing damages. *Cf. Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265, 66 S.Ct. 574, 580, 90 L.Ed. 652, 660 (1946).

Finally, we have strong reservations about whether the damage award should have been trebled. Such award is within the discretion of the District Court when the infringement is willful and wanton. The jury's general verdict made no finding on willful or wanton infringement since the issue of damages was not tried to the jury and since the issue of liability was submitted in the form of a general verdict as discussed above. In fact, the District Judge who presided over the trial, having been assassinated, was replaced by another District Judge for the determination of damages. Moreover, we have much doubt that there is sufficient evidence of willful and wanton infringement to support such treble damages. This Court has held that where the issue of patentability is "close and litigated in good faith, the court should be more reluctant to impose punitive dam-

ages." *Yoder Bros., Inc. v. California-Florida Plant Corp.*, 537 F.2d 1347, 1383 (5th Cir. 1976), *cert. denied*, 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977). Certainly the issue of validity is a close one here, depending largely on the issue of prior art, the Cavins Corp. tools. Laughlin's device did not contain possibly the only patentable feature of Baumstimler's tool, the interchangeable orifice. Laughlin also could have maintained a reasonable doubt as to the validity of the Baumstimler patent since he, Laughlin, was familiar with the Cavins tools. That his belief was reasonable is also illustrated by Baumstimler's disclaimer, almost 10 years after the award of the patent, and three years after institution of this lawsuit, of five of the seven claims in one of the patents.

Upon retrial, we would urge the District Court to submit a special interrogatory on the issue of willful and wanton infringement and to provide a more thorough analysis of the relevant market and the evidence supporting the determination of Baumstimler's lost profits, that is how the profit margin was determined, and what effect, if any, BPC's lack of a license and relationship to Baumstimler has on the determination of damages.

With submission under proper instructions, along with special interrogatories under F.R.Civ.P. 49(a) and consideration of our perhaps too lengthy comments on the prior trial, should this case come before us again for review, the process will be much briefer.

REVERSED AND REMANDED.