DATASCOPE CORP., Plaintiff,

v.

SMEC, INC., Defendant.

Civ. A. No. 81–3948.

United States District Court,
D. New Jersey.

Jan. 19, 1988.

Greenberg, Dauber, Epstein, Newark, N.J., Fitzpatrick, Cella, Harper & Scinto, New York City, for plaintiff.

Shanley & Fisher, Morristown, N.J., for defendant.

## OPINION

CLARKSON S. FISHER, District Judge.

This is a patent infringement suit in which this court has previously found the defendant, SMEC, Inc., liable for infringement of certain patents held by plaintiff, Datascope Corporation. *Datascope Corp. v. SMEC, Inc.*, 594 F.Supp. 1306 (D.N.J. 1984), *aff'd and rev'd in part*, 776 F.2d 320 (Fed.Cir.1985). Having concluded a trial on the liability phase of this case, the following constitute my findings of fact and conclusions of law as to damages.

### I. *Applicable Law*

■ Damages in a patent infringement suit are governed by 35 U.S.C. § 284, which provides:

Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed.

The court may receive expert testimony as an aid to the determination of damages or of what royalty would be reasonable under the circumstances.

In *Aro Manufacturing Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507, 84 S.Ct. 1526, 1543, 12 L.Ed.2d 457 (1964), the Supreme Court stated:

But the present statutory rule [35 U.S.C. § 284] is that only "damages" may be recovered. These have been defined by this court as "compensation for the pecuniary loss he [the patentee] has suffered from the infringement, without regard to the question whether the defendant has gained or lost by his unlawful acts." *Coupe v. Royer*, 155 U.S. 565, 582, 39 L.Ed. 263, 269, 15 S.Ct. 199 [206] (1895). They have been said to constitute "the difference between his pecuniary condition after the infringement, and what his condition would have been had the infringement not occurred."

While the statute provides that a patent holder who has suffered infringement at the hands of another is to be awarded, at the very least, a "reasonable royalty," the basic question remains, "Had the infringer not infringed, what would patent holder-licensee have made?" *Livesay Window Co. v. Livesay Industries, Inc.*, 251 F.2d 469, 471 (5th Cir.1958), *quoted in Aro Manufacturing Co., supra*, 377 U.S. at 507, 84 S.Ct. at 1543. As such, a successful claimant in an infringement suit may recover his lost profits where it can be demonstrated that the patent holder would have made the sales, "but for" the infringing activity. *Bio–Rad Laboratories, Inc. v. Nicolet Instrument Corp.*, 739 F.2d 604, 616 (Fed. Cir.1984); *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 553 (Fed.Cir. 1984).

■ In *Panduit Corp. v. Stahlin Bros. Fiberworks, Inc.*, 575 F.2d 1152 (6th Cir. 1978), the court articulated the requirements of the aforementioned "but for" rule:

To obtain as damages the profits on sales he [the patentee] would have made absent the infringement, i.e., the sales made by the infringer, the patent owner

must prove: (1) demand for the patented product, (2) absence of acceptable non-infringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made.

To recover lost profits, the prevailing patent owner carries the burden of establishing that all four elements of the "but for" test are fulfilled. Should he fail in this regard, he is entitled only to a reasonable royalty. 35 U.S.C. § 284.

■ Although § 284 provides no particular method of calculating a reasonable royalty, there are a number of identifiable factors to be considered. In *Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y.1970), the court noted that a hypothetical license negotiation

> ... would involve a marketplace confrontation of the parties, the outcome of which would depend upon such factors as their relative bargaining strenghths; the anticipated amount of profits that the prospective licensor reasonably thinks he would lose as a result of licensing the patent as compared to the anticipated royalty income; the anticipated amount of net profits that the prospective licensee reasonably thinks he will make; the commercial past performance of the invention in terms of public acceptance and profits; the market to be tapped; and any other economic factor that normally prudent businessmen would, under similar circumstances, take into consideration in negotiating the hypothetical license.

*Id.* at 1122. Of course, the court recognized that subsumed within the definition of a reasonable royalty is the infringer's ultimate profit. Thus, it is equally necessary to consider the amount a licensee would be willing to pay. *Id.* at 1122.

## II. *Findings of Fact.*

Throughout the infringing period, 1981 through 1984, there were three suppliers of percutaneous balloons, Datascope, SMEC and Kontron. Datascope and Kontron divided 96% of the market, while SMEC retained 4% between 1981 and 1984.

Datascope's primary competitor in the market was Kontron. Datascope's sales projections throughout the infringing period reveal that Datascope sought to increase its market share at the expense of Kontron. These sales projections also reveal SMEC's market share remained constant at 4%.

SMEC entered the market for percutaneous balloons in March, 1981. At that time, many doctors were wary of the percutaneous method for medical reasons. Although a precise moment in time is unascertainable, the percutaneous procedure gradually gained acceptance and by 1983–1984 had become the method of choice among doctors.

Despite the early skepticism in the medical community, many doctors purchased the SMEC balloon in 1981. This is due primarily to the high esteem in which the doctors held Peter Schiff, the President of SMEC, and the doctors' previous experience with SMEC's products.

These doctors testified that it was because of Schiff that they purchased the SMEC balloon at a point in time earlier than they would normally have adopted the percutaneous method. Dr. Gerald Geisler's testimony is representative:

Q. Why did you choose to use the SMEC percutaneous balloon, as opposed to anybody else's percutaneous balloon?

A. Well, from the beginning of our experience with balloon pumping, we had worked very closely with Mr. Schiff and had a great deal of confidence in his products and in his advice.

Q. If SMEC had not come out on the market with a percutaneous balloon in 1981, would you have switched to a percutaneous balloon when you did?

A. No.

Q. Why not?

A. Mainly because I didn't like the concept of the percutaneous balloon.

Percutaneous balloons did, however, offer a number of benefits over surgical balloons. Prior to the introduction of the per-

cutaneous technology, surgical balloons were the catheter of choice among doctors. Among the advantages of percutaneous insertion are that it requires use of local anaesthesia to a lesser extent that does the surgical method; a percutaneous balloon can be inserted more quickly and easily into the patient; and it avoids a painful incision while the patient is under local anaesthesia.

As these advantages became known among doctors, the percutaneous method gained greater acceptance. The court finds that regardless of the doctors' high regard for Schiff and SMEC, these doctors would have adopted the percutaneous method because of these advantages.

Of the 4% of the market which SMEC held during the infringing period, its largest customers were foreign hospitals. Indeed, some 13% of the infringing sales were made to the foreign customers. I find that Datascope's production and marketing operations were physically capable of absorbing much of SMEC's 4% market share, but also that Datascope had no capability of capturing the sales made to SMEC's foreign customers. Datascope had sales representatives assigned to fourteen sales regions throughout the United States. There is no evidence that Datascope sought to compete with SMEC for its sales to foreign customers. Indeed, the evidence reveals that Datascope's sales representatives never even contacted these foreign customers. This is so despite the testimony of Robert Rewolinski, the former national sales manager for Datascope, that Datascope sales representatives were instructed to go after all competitive accounts.

As previously noted, Kontron was Datascope's major competitor in the percutaneous balloon catheter market. Kontron entered the market in 1981 with a dual lumen balloon catheter. Upon introduction of Kontron's IAB, it immediately captured a significant market share. This market share was maintained throughout the infringing period.

Datascope has instituted an infringement suit against Kontron in the United States District Court for the District of Massachusetts. Datascope alleges in that suit that both Kontron's single lumen and dual lumen infringe its '339 patent. Kontron has been preliminarily enjoined from selling the single lumen device and, although the court refused to enjoin the sale of the dual lumen IAB, there was a finding that Datascope had a reasonable likelihood of success in establishing infringement by the dual lumen device. *Datascope Corp. v. Kontron, Inc.*, 611 F.Supp. 889, 894–95 (D.Mass. 1985).

The Federal Circuit, however, commented unfavorably on Datascope's "equivalent to an equivalent" theory of establishing infringement. *Datascope Corp. v. Kontron, Inc.*, 786 F.2d 398 (Fed.Cir.1986). In any event, the District Court of Massachusetts' finding that Datascope had a reasonable likelihood of success is not dispositive here. To establish its claim for lost profits, Datascope must show to a preponderance of the evidence that there were no noninfringing alternatives. In this regard, Datascope undertakes a heavy burden.

There are significant differences in the Kontron dual lumen balloon and the Datascope single lumen balloon which is the subject of the '339 patent. First, the Kontron device uses a hollow metal cylinder support member, as opposed to a rod or wire as described in the Datascope patent. Second, the Datascope patent does not operate as a dual lumen device because the structural configuration of the support member in the Datascope patent would cause gas and blood to mix. I find that, based on the evidence submitted at trial and for the purposes of this case, the Kontron balloon is a noninfringing alternative to the patented device.

The defendant submits several other possible noninfringing alternatives. SMEC may not, however, rely on its 1980 prototype of a prewrapped balloon as a noninfringing alternative. Although this prewrapped prototype was developed at the same time Schiff developed the single lumen device which was ultimately found to be infringing, Schiff subsequently abandoned the prototype in favor of the single

lumen device. The evidence reveals that Schiff, himself, had doubts as to the efficacy of the design. Although Schiff testified that he subsequently concluded his early uncertainty as to the design of the 1980 prototype was unfounded, this testimony is hindsight and made with the benefit of several years of familiarity with the technique.

Moreover, the prewrapped design of the 1980 prototype was a significant departure from the twisting style which was ultimately found to have infringed Datascope's patent. Up to 1981, the only percutaneous design which had been successfully utilized was the twisting method developed by Datascope. Given the apprehension within the medical community in 1981, it is indeed speculative to conclude that the 1980 prewrapped prototype would be acceptable as a viable market alternative to the twisting device. Finally, I note that the 1980 prewrapped model was never brought to the market. I conclude, therefore, that the 1980 prewrapped design was not available as a noninfringing alternative.

Shortly after this court enjoined the sale of SMEC's twisting balloon, Schiff introduced the "Sidewinder" percutaneous balloon. The "Sidewinder" is a prewraped balloon which evolved from the prototype developed by Schiff in 1980. The "Sidewinder" does not infringe on Datascope's '339 patent.

The Food and Drug Administration's 510(k) application for the "Sidewinder" was filed by SMEC in August, 1983. The application was approved on October 15, 1984. Although Schiff testified that the "Sidewinder" was developed to the point it could have been commercially manufactured by June, 1982, and that, had the FDA application been filed in 1982, approval could have been obtained within four to five months, I find this testimony unpersuasive. The simple fact remains that FDA approval for the "Sidewinder" was not obtained until October, 1984. This court preliminarily enjoined SMEC from the sale of the twisting balloon in December, 1984. Accordingly, the court concludes that the "Sidewinder" was not available as a noninfringing alter-native, inasmuch as the "Sidewinder" could not have been brought to market absent FDA approval, and that approval was not obtained until October, 1984. Datascope's arguments concerning the earlier time frame in which the "Sidewinder" could have been brought to market are speculative at best.

### III. *Conclusions of Law*

The preliminary injunction entered in this action is made permanent. SMEC has been adjudged to have infringed Datascope's '339 patent. In *Smith International, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed.Cir.1983), the court stated, "We hold that where validity and continued infringement have been clearly established, as in this case, immediate irreparable harm is presumed." Likewise, the entry of a permanent injunction in this case is appropriate.

#### a. Lost Profits

As noted above, the principal question with regard to lost profits is whether the patent holder would have made the sales "but for" the presence of the infringing product on the market. The court concludes that Datascope has not carried its burden of proof in establishing entitlement to lost profits and, therefore, will be awarded a reasonable royalty.

In particular, the third element set forth in *Panduit Corp., supra,* requires the patentee to show its manufacturing and marketing capability to exploit the demand for the product. In this regard, two points are significant. First, in early 1981 and for a short time thereafter, the market demand for the product was significantly less than what it would later become. Indeed, several doctors testified that at that time they were not ready to fully accept the percutaneous method. The evidence clearly shows that many of the sales made at that time by SMEC were made because of the doctors' confidence in Schiff. Further, the evidence showed that many of SMEC's customers would not have switched from using surgical balloons to percutaneous balloons but for that faith in Schiff.

Second, and more significantly, Datascope has made no showing that it could

have captured the sizable number of foreign sales made by SMEC. Although its sales team was divided into regions throughout the United States, no sales representatives were assigned to foreign customers. Indeed, no attempt was ever made at making inroads in the area.

Datascope has also failed to satisfy the second element of the *Panduit* test, which requires the absence of acceptable noninfringing substitutes. There were, however, three sellers in the relevant market. This court has concluded that, for the purposes of this action, Kontron's dual lumen balloon is an acceptable noninfringing alternative to Datascope's '339 patent. It would strain credulity to hold the Kontron balloon to be an unacceptable alternative. Immediately upon its introduction into the market in 1981, Kontron captured a significant portion of the market. Indeed, for a time Datascope's sales had decreased upon the arrival on the market of the Kontron device.

The presence of the Kontron dual lumen balloon on the market precludes a finding that Datascope would have made the sales which were made by SMEC. There is no presumption that SMEC's customers would have purchased from Datascope. *Oil Well Improvements Co. v. Acme Foundry and Machine Co.,* 31 F.2d 898, 901 (8th Cir. 1929). Nor is there sufficient evidence to award lost profits based on the market share held by Datascope vis-a-vis Kontron. In *Baumstimler v. Rankin,* 677 F.2d 1061 (5th Cir.1982), the court stated:

> In this case, the district court determined that the competing tool, that sold by Cavins, held 10% of this market. This alone is not sufficient to determine that Baumstimler would have received 90% of the market since possibly the infringers cut only Baumstimler's market but that of Cavins as well.

*Id.* at 1072. Herein, SMEC competed with both Datascope and Kontron. Although Datascope suggests that if the Kontron device is held to be noninfringing an award of 65% of its lost profits is appropriate, reflecting its share of the market, I do not agree. The patent holder must prove to a "reasonable probability" the portion of the infringing sales it would have made. *Hughes Tool Co. v. W. Murphy Industries, Inc.,* 491 F.2d 923, 930 (5th Cir.1973). The decision to purchase a particular balloon, however, is a decidedly subjective one. The president of Datascope conceded as much:

> Q. Therefore, between the period beginning 1981 and the end of 1984, you knew that SMEC was selling percutaneous intra-aortic balloons; isn't that true?
>
> A. Yes.
>
> Q. Why do you think people were buying them?
>
> A. They prefer to buy SMEC devices.
>
> Q. In the final analysis, sir, it is the subjective decision of your purchasers as to why the purchaser chooses one or another; isn't that so?
>
> A. Yes.

Tr. May 19, p. 60. Although Datascope offers a number of comparisons between its device and Kontron's, suggesting Datascope would have garnered these sales, these contentions are, on the whole, unpersuasive. Datascope has failed to carry its burden of proof for a number of reasons. Several of SMEC's customers indicated an unwillingness to use Datascope's balloon. The original Datascope balloon had evoked a number of complaints. There is nothing in the record to suggest that either Datascope or Kontron could have captured the early sales made by SMEC, in view of both the skepticism of the technique within the medical community at that time, and the loyalty of SMEC's customers. Indeed, the evidence establishes that, at the time, SMEC's customers would not have adopted the percutaneous balloons manufactured by any other company. In all probability, these sales would not have been made.

Finally, a noninfringing alternative, *i.e.,* the Kontron balloon, had captured a sizable portion of the market upon its introduction. As in *Baumstimler, supra,* there is a possibility that SMEC's sales after the technology gained widespread acceptance cut into Kontron's potential market as well. Viewed together, these factors compel the conclusion that Datascope has not estab-

lished an entitlement to any or all of its claim of lost profits. Accordingly, the court will award a reasonable royalty.

### b. Reasonable Royalty

 In fixing a reasonable royalty as damages, the court in *Panduit Corp., supra,* stated:

> The key element in setting a reasonable royalty after determination of validity and infringement is the necessity for return to the date when the infringement began.

*Id.* at 1158. In *Georgia–Pacific Corp. v. United States Plywood Corp., supra,* a reasonable royalty was described in this way:

> The sum allowed should be reasonable and that which would be accepted by a prudent licensee who wished to obtain a license but was not so compelled and a prudent patentee, who wished to grant a license but was not so compelled.

*Id.* at 1121, *quoting Horvath v. McCord Radiator and Mfg. Co.,* 100 F.2d 326, 335 (6th Cir.1938). Thus, in considering a "hypothetical negotiation," conducted in March, 1981, when the infringement began, several facts are necessary to set the stage. Further, the court must assume that both parties were privy to all pertinent information. *Georgia–Pacific Corp., supra,* at 1121. At that time, Datascope held a 100% market share in the percutaneous IAB field. At that time, Schiff was having difficulty in successfully completing his prewrapped prototype. Indeed, those difficulties led him to adopt the twisting style design which was ultimately found to be infringing. Among the considerations brought to bear by Schiff in adopting the infringing design was the fact that that particular device was the only one that had been successfully used to date. Given the uncertainty existing at the time with regard to the percutaneous technology, the only practical device available to Schiff was the twisting design. Moreover, Schiff considered Datascope's introduction of a percutaneous balloon to be a significant development in the market. Considering Datascope's then 100% maarket share alongside SMEC's difficulty in developing an alterna-

tive noninfringing device, as well as its desire to enter a market deemed significant by its president, I conclude that SMEC would have been willing to pay a higher royalty rate than the modest rate it now argues for. Likewise, given Datascope's 100% market share, I conclude that Datascope would have demanded a favorable royalty rate, particularly in view of the fact that it would be granting a license to a competitor in a market of limited participants.

SMEC's claim that the royalty should not exceed 1.75% of the infringing sales is rejected. The report and testimony of SMEC's expert on this point are based primarily on the assumption that the patent was relatively easy to design around, as evidenced by the relative ease and speed with which SMEC's "Sidewinder" balloon was brought to the market in 1985. A simple response to this contention is that the "Sidewinder" was brought to the market in 1985 and the royalty rate must be determined with reference to the facts as they existed in early 1981. SMEC argues that because of the relative ease in developing the "Sidewinder" balloon, its barrier to entry into the percutaneous balloon market was relatively insignificant. In view of the facts as they existed in March, 1981, noted above, the court's conclusion is to the contrary, to wit: I conclude that SMEC faced a relatively significant barrier to entry into that market. Indeed, SMEC lost customers during the period that Datascope was the only company on the market with a percutaneous balloon. Further, the evidence revealed a certain urgency on SMEC's part prior to entering the percutaneous market. Schiff's deposition testimony concerning the filing of the FDA 510(k) applications in December, 1980, is illustrative:

> I listed the 510(k) application of December 19 as being a minor modification of my application of December 1. I wanted that date, December 1, to prevail. I did not want this listed as a new application and lose 19 more days, lose 18 more days; and immediately after that submission, within several days, we sent out balloons, the twisting design, to approximately ten or fifteen doctors....

SMEC's alternative argument that a reasonable royalty should not exceed 2.5% is also rejected. This, too, is based on the assumption that SMEC faced little difficulty in entering the market. Quite simply, it is an assumption not warranted in fact.

Among the factors to be considered in establishing a royalty is any previous royalty standard within the industry. SMEC's expert, Ralph Lilore, testified that in the medical field a reasonable royalty ranges between 2% and 4% for a nonexclusive license. Although the court has rejected Lilore's conclusion, there is no evidence which contradicts these ranges. As noted previously, Datascope would have demanded a more favorable royalty from SMEC under the circumstances existing in March, 1981. Given the importance attached to market entry by SMEC, as well as its difficulty in designing around the '339 patent and Datascope's then existing 100% market share, I further conclude that Datascope would have been in a uniquely strong bargaining position.

Of the list of pertinent factors noted in *Georgia–Pacific Corp.*, *supra*, the court noted two considerations applicable herein:

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, that have been used for working out similar results.

318 F.Supp. at 1120.

In this case, the court cannot ignore the widespread acceptance that the percutaneous technology subsequently achieved. Despite the aforementioned early doubts within the medical community, the method was rapidly accepted within a year to a year and a half. By 1984, when this suit was instituted, the percutaneous technology had all but replaced the prior art. The court has already noted several of the particular advantages of this method, as opposed to the use of surgical balloons. Moreover, the evidence reveals that the relatively prompt acceptance of the technology was not lost upon Schiff and SMEC.

Considering these factors together, the court concludes that even though the evidence indicated that a reasonable royalty in this field ranges from 2% to 4%, I find that the circumstances as they existed would have compelled willing negotiators to go even beyond a 4% royalty. Giving due regard to SMEC's concern for its profits, I conclude that willing negotiators would have agreed upon a royalty equivalent to 5% of the infringing sales.

### c. Treble Damages

■ Where the proof at trial shows the infringement to be willful, the damage award may be trebled. Where a potential infringer has notice of the rights of another in a patent, the potential infringer has a duty to exercise due care and to determine whether or not he is infringing. *Ralston Purina Co. v. Far–Mar Co., Inc.*, 772 F.2d 1570, 1577 (Fed.Cir.1985). In the present case, SMEC sought advice of counsel with regard to Datascope's patents prior to entering the market. Merely obtaining an opinion, however, is not dispositive on a question of whether or not the infringer acted in good faith and without intent to infringe. *Kori Corp. v. Wilco Marsh Buggies and Drag Lines, Inc.*, 761 F.2d 649 at 656 (Fed.Cir.1985).

■ The court concludes that SMEC's infringement was not willful. In *Lam, Inc. v. Johns Manville Corp.*, 668 F.2d 462, 474 (10th Cir.1982), the court stated, "An infringer who reasonably doubted the patent was valid has not willfully infringed the patent." Herein, SMEC sought an opinion from its attorneys concerning the validity and possible infringements of patents held by Datascope. Although SMEC was faced with pressure to enter the market, it sought counsel's advice at a time when Schiff was still attempting to develop his noninfringing prewrapped prototype. It was not until Schiff abandoned that effort due to the prototype's failure to work consistently that the market pressure on SMEC increased. Although Schiff retained some skepticism, that does not preclude a finding that the infringement was not willful. The court concludes that, at a minimum, an honest doubt existed as to the

validity and infringement of Datascope's patents.

Moreover, in *Dickey–John Corp. v. Intern. Tapetronics Corp.*, 710 F.2d 329, 348 (7th Cir.1983), the court noted, "where close questions are presented regarding the infringement issue, obviously a finding of willful and wanton infringement is ordinarily inappropriate." Indeed, the Federal Circuit, in affirming the judgment of liability, was not unanimous. *Datascope v. SMEC*, 776 F.2d at 328 (Judge Davis, dissenting). Therefore, Datascope's request for treble damages and attorney's fees is denied. For the same reasons, the claim for attorney's fees pursuant to 35 U.S.C. 285 is denied.

### d. Pre–Judgment Interest

In *General Motors v. Devex Corp.*, 461 U.S. 648, 655, 103 S.Ct. 2058, 2062, 76 L.Ed. 2d 211 (1983), the Supreme Court held:

> The standard governing the award of prejudgment interest under § 284 should be consistent with Congress's overriding purpose of affording patent owners complete compensation. In light of that purpose, we conclude that prejudgment interest should ordinarily be awarded. In the typical case an award of prejudgment interest is necessary to ensure that the patent owner is placed in as good a position as he would have been had the infringer entered into a reasonable royalty agreement.

*See also Underwater Devices, Inc. v. Morrision–Knudsen Co., Inc.*, 717 F.2d 1380, 1389 (Fed.Cir.1983). On the basis of the substantial record before this court I find no justification for withholding an award of prejudgment interest in this case. *See Devex Corp., supra,* 461 U.S. at 657, 103 S.Ct. at 2063.